**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| JURISICH OYSTERS, LLC;<br>AMERIPURE PROCESSING, INC.;<br>MATTHEW TESVICH;<br>INTERNATIONAL MARINE MAMMAL<br>    PROJECT OF EARTH ISLAND<br>    INSTITUTE;<br>ALERT PROJECT OF EARTH ISLAND<br>    INSTITUTE; and<br>EARTH ISLAND INSTITUTE,<br><br>               *Plaintiffs*,<br><br>     v.<br><br>U.S. ARMY CORPS OF ENGINEERS;<br>U.S. NATIONAL MARINE FISHERIES<br>    SERVICE; and<br>U.S. FISH AND WILDLIFE SERVICE,<br><br>               *Defendants*. | Case No. _____<br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## <u>INTRODUCTION</u>

1.     This case challenges the decision by the United States Army Corps of Engineers ("Army Corps") to authorize the massive and controversial Mid-Barataria Sediment Diversion Project ("MBSD Project" or "Project"), which is the single largest ecosystem restoration project in the history of the United States.

2.     The Project will divert immense volumes of sediment and freshwater from the Mississippi River to the Barataria Basin in southern Louisiana in an attempt to restore deltaic processes, rebuild freshwater wetlands, and support coastal resiliency to climate change and sea level rise. However, despite its lofty purpose, the Project will have serious, permanent, adverse impacts on the Barataria Basin's resources. For example, the influx of riverine freshwater will

1

permanently alter water quality in the Barataria Basin which, in turn, is projected to decimate a local population of resident bottlenose dolphins. Alterations in salinity, temperature, and nutrient concentrations are also expected to seriously disrupt (or even destroy) commercially important fisheries in the Barataria Basin, threatening many local residents' livelihoods and jeopardizing economic stability in these communities for decades into the future. The Basin's water quality will likewise be degraded by the introduction of contaminants and hazardous materials carried by the riverine water and sediment, which in turn, will adversely affect not only human health, but also the various species that reside in the Basin and their habitat. Faced with such controversy, the Army Corps nevertheless asserts that the largely unproven benefits of the MBSD Project outweigh the collateral, irreversible ecological and economic damage that is certain to result from this large-scale diversion.

3.    Plaintiffs—a coalition of conservationists, commercial and recreational fishermen, and local residents—allege that the Army Corps violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), in connection with the agency's December 19, 2022 Record of Decision ("ROD") authorizing the Project, and the Army Corps' September 2022 Final Environmental Impact Statement ("Final EIS" or "FEIS") underlying the ROD. In addition, Plaintiffs allege that the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") violated the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and the APA, when FWS concurred in the Army Corps' determination that the Project will not adversely affect federally protected bird and sea turtle species that are present in the Project area, and when NMFS issued a biological opinion for three federally protected sea turtle species.

## JURISDICTION

4.     This case arises under the judicial review provisions of the APA, 5 U.S.C. §§ 704,

706, as well as the citizen-suit provision of the ESA, 16 U.S.C. § 1540. This Court has

jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## PARTIES

### JURISICH OYSTERS, LLC

5.     Jurisich Oysters, LLC ("Jurisich") is a Louisiana limited liability company with

its principal place of business located in Nairn, Plaquemines Parish, Louisiana and whose

members, Mitchell B. Jurisich, Jr. and Frank Jurisich, are both individuals domiciled in the

Parish of Plaquemines, State of Louisiana. Jurisich is a century-old oyster farming business that

grows and harvests oysters in the Barataria Basin. Jurisich's members undertake professional and

recreational activities in the basin, including oyster farming, boating, hunting, fishing, and

wildlife viewing. Jurisich's members have significant, concrete interests in the preservation and

protection of the Barataria Basin's ecosystem processes and the species that comprise and

perpetuate them.

6.     For example, Jurisich earns a majority of its revenue from the harvesting of

oysters in the Barataria Basin in Plaquemines Parish, Louisiana. Accordingly, Jurisich has

significant interests in maintaining the high water quality and delicate salinity balance required

to support shellfish farms. Moreover, Jurisich's members have deep familial and personal ties to

the region, and have significant personal and aesthetic interests in the biological integrity of the

Barataria Basin. Jurisich's members are proud of the region's long history of oyster farming and

the role their oysters play in maintaining the basin's ecosystem, wildlife, and habitats. Jurisich's

members engage in and enjoy recreational boating, hunting, and fishing in the Barataria Basin.

Jurisich's members also enjoy viewing wildlife as they work on the oyster beds, including federally-listed threatened and endangered species. Jurisich's members also enjoy viewing the Barataria Basin's wildlife while recreating in the area. These members are aware that the degradation of water quality and contamination of the basin has serious, adverse impacts on their economic, professional, and personal interests in the Barataria Basin, its oysters, other wildlife (including threatened and endangered species), and habitats. Jurisich's members intend to continue to use and enjoy the Barataria Basin frequently and on an ongoing basis in the future, and have concrete plans to return to the area impacted by the MBSD Project.

7.      Jurisich is concerned with the negative impacts that the MBSD Project will have on the Barataria Basin ecosystem, particularly on the existing wildlife and marshland that is essential to the harvesting of oysters. As planned, the MBSD Project will introduce an excessive amount of freshwater into the basin, resulting in the destruction of oysters and oyster reefs. In turn, the destruction of said oysters and reefs will reduce the filtration of water in the basin, leading to the rise of harmful nutrients that pose a risk to the entire ecosystem, including, but not limited to a thriving habitat for various fish, birds, dolphins, and other important species.

8.      The MBSD Project will indisputably harm the economic, personal, professional, and aesthetic interests of Jurisich and its members. As explained, Jurisich earns a majority of its revenue from the harvesting of oysters in the basin and therefore rely on the relatively high water quality present in the Barataria Basin for their livelihoods. Due to the devastating impacts that the MBSD Project will have on salinity and water quality in the basin, the Project will destroy the oyster beds that have existed for decades, eliminating most, if not all, of Jurisich's oyster harvest revenue. Additionally, by introducing contaminated riverine water into the basin, the

MBSD Project will harm the delicate ecosystem that supports the diverse wildlife and habitats in which Jurisich's members have significant personal and aesthetic interests.

9.      Jurisich communicated its concerns regarding the impacts of the MBSD Project to the Army Corps during the NEPA process. On June 3, 2021, Jurisich Oysters, LLC submitted comments on the Draft EIS, arguing that the Army Corps "fails to recognize the certain damages that will result from the MBSD [Project] . . . in exchange for only the hopeful creation of marshland."

10.      The legal violations alleged in this Complaint, traceable directly to the Army Corps, NMFS, and FWS's conduct, cause concrete injury to the aesthetic, professional, recreational, and wildlife preservation interests of Jurisich and its members, including by adversely affecting the health and behavior of ESA-listed sea turtles and birds, as well as other wildlife that Jurisich and its members enjoy observing and otherwise benefit from. These actual, concrete interests have been, are currently being, and, absent relief from this Court, will continue to be adversely and irreversibly injured by the Army Corps, NMFS, and FWS's failure to comply with federal law. Relief from this Court, including vacatur of the challenged permit, EIS, BiOp, and concurrence, pending full compliance with the APA, NEPA, the ESA, and other legal requirements, will remedy Plaintiff's injuries because such relief would mean that the Army Corps, NMFS, and FWS must fully consider the direct, indirect, and cumulative impacts of their actions on the environment, as well as the adverse effects of their actions on endangered and threatened species. As a result of this reconsideration, the agencies may implement alternatives to the Project with fewer adverse environmental impacts.

**AMERIPURE PROCESSING, INC.**

11.     Ameripure Processing Company, Inc. ("Ameripure") is a Louisiana corporation formed in 1995 by a fourth generation Louisiana oyster grower, John Tesvich, with its principal place of business in Belle Chasse, Louisiana. Ameripure is one of only a few, larger oyster processing plants left operating in Louisiana, and processes oysters harvested from the Barataria Basin, which are then shipped to customers across the country. Ameripure also manages private oyster leases in Louisiana, and has docks at several locations in Louisiana and Texas, for sourcing gulf oysters. Ameripure currently employs about thirty people and earns a majority of its revenue from the processing of oysters harvested from the Barataria Basin in Plaquemines Parish, Louisiana.

12.     Ameripure and its officers and directors, including its President John A. Tesvich, have significant, concrete professional, health, personal, and aesthetic interests in the Barataria Basin. Ameripure's officers and directors have a long history of oyster farming in the region, and take great personal and professional pride in the role their farms play in the Barataria Basin's ecosystem. Because oysters are eaten raw, the cleanliness of oyster-growing waters is a significant health concern for Ameripure, its officers and directors, and the general public. Accordingly, maintaining high water quality to support both their farms and a healthy ecosystem is of great interest to Ameripure's officers and directors. Additionally, as fourth-generation oyster farmers, Ameripure's officers and directors have longstanding personal and familial ties to the region, and feel deep personal and spiritual connections to the basin's wildlife and habitats. Ameripure's officers and directors engage in and enjoy recreational boating, hunting, and fishing in the Barataria Basin.  For example, Ameripure's officers and directors derive aesthetic, recreational, and spiritual benefits from viewing the basin's wildlife, including threatened and

6

endangered species, while working and recreating in the region. These officers and directors likewise have significant, concrete personal, professional, aesthetic, health, and spiritual interests in preserving and maintaining the integrity of the Barataria Basin's ecosystem, which in turn will allow the basin's wildlife and habitats to flourish.

13.     The MBSD Project will have serious adverse impacts on the personal, professional, aesthetic, health, and spiritual interests of Ameripure and its officers and directors, including (but not limited to) the destruction of oysters, oyster reefs, and other wildlife dependent upon the present brackish water conditions of the marsh. By reconnecting the Mississippi River to the Barataria Basin, the MBSD Project threatens to permanently alter the Barataria Basin's ecology and ecosystems and severely degrade the basin's water quality, which in turn will devastate the region's oysters and other wildlife. Significantly, the threat that the MBSD Project presents to the piping plover, red knot, and sea turtles is acutely aligned with the threat to the oysters located in the common Barataria Basin estuary. The oysters in an estuary are akin to the "canary in the coal mine" in that their health is a strong indicator of the overall health of the basin's ecosystem. Oysters quickly alert farmers, resource managers, environmentalists, and the public to the presence of pollution and poor water quality, which if allowed to continue, will carry severe consequences to the Barataria Basin at large.

14.     The professional, health, aesthetic, recreational, and spiritual interests of Ameripure and its officers and directors have been and will continue to be adversely affected by the construction and operation of the MBSD Project. By introducing contaminated riverine water and sediments into the basin, and by disturbing existing contaminated sediments, the Project will impair the ability of Ameripure's officers and directors to observe and enjoy the natural

ecological processes that occur in the Barataria Basin, including in and around its oyster leases. The Project will also impair the ability of Ameripure's officers and directors to observe and enjoy the basin's wildlife, including threatened and endangered species. These strong interests in the Barataria Basin ecosystem are harmed by the Army Corps' failure to take a hard look at the Project's foreseeable impacts, as well as by the failure by NMFS and FWS to critically examine the effects of the Project on threatened and endangered species.

15.     Ameripure participated in the NEPA process for the Project by commenting on the Draft EIS, asserting that the Army Corps and CPRA failed to fully consider "the negative environmental and socio-economic impacts that large-scale diversions will cause in their cost-benefit analysis of [the] [P]roject."

16.     The legal violations alleged in this Complaint, traceable directly to the Army Corps, NMFS, and FWS's conduct, cause concrete injury to the aesthetic, professional, recreational, and wildlife preservation interests of Ameripure and its officers and directors, including by adversely affecting the health and behavior of ESA-listed sea turtles and birds, as well as other wildlife that Ameripure's officers and directors enjoy observing and otherwise benefit from. These actual, concrete interests have been, are currently being, and, absent relief from this Court, will continue to be adversely and irreversibly injured by the Army Corps, NMFS, and FWS's failure to comply with federal law. Relief from this Court, including vacatur of the challenged permit, EIS, BiOp, and concurrence, pending full compliance with the APA, NEPA, the ESA, and other legal requirements, will remedy Plaintiff's injuries because such relief would mean that the Army Corps, NMFS, and FWS must fully consider the direct, indirect, and cumulative impacts of their actions on the environment, as well as the adverse effects of

their actions on endangered and threatened species. As a result of this reconsideration, the agencies may implement alternatives to the Project with fewer adverse environmental impacts.

## MATTHEW TESVICH

17.     Matthew Tesvich ("Tesvich") is a person of full age of majority domiciled in the Parish of Plaquemines, State of Louisiana.  Tesvich is a fourth-generation oyster fisherman, who earns his living as commercial oyster fishermen.  The MBSD and its destruction of the oyster resources in the Barataria Basin will greatly affect Tesvich's ability to earn a living in Plaquemines Parish.  Tesvich earns a majority of his income from the harvesting of oysters in the Barataria Basin in Plaquemines Parish, Louisiana.  The MBSD will eliminate most, if not all, of Tesvich's oyster harvest income.

18.     Mr. Tesvich grew up in Plaquemines Parish and has interacted with the ecosystem and wildlife surrounding the Baratarian Basis waters. Mr. Tesvich engages in and enjoys recreational boating, hunting, and fishing in the Barataria Basin. He has concrete aesthetic, recreational, and spiritual interests in the biological integrity of the Barataria Basin, including its water quality, as well as in the wildlife that reside there. Mr. Tesvich has concrete plans to continue engaging in recreational activities in the Barataria Basin, including in the areas that will be impacted by the MBSD Project.

19.     The MBSD Project will have serious adverse impacts on Mr. Tesvich's personal, professional, aesthetic, health, and spiritual interests, including (but not limited to) the destruction of oysters, oyster reefs, and other wildlife dependent upon the present brackish water conditions of the marsh. By reconnecting the Mississippi River to the Barataria Basin, the MBSD Project threatens to permanently alter the Barataria Basin's ecology and ecosystems and severely degrade the basin's water quality, which in turn will devastate the region's oysters and other

9

wildlife. By introducing contaminated riverine water and sediments into the basin, and by disturbing existing contaminated sediments, the Project will impair Mr. Tesvich's ability to observe and enjoy the natural ecological processes that occur in the Barataria Basin. The Project will also impair Mr. Tesvich's ability to observe and enjoy the basin's wildlife, including threatened and endangered species. These strong interests in the Barataria Basin ecosystem are harmed by the Army Corps' failure to take a hard look at the Project's foreseeable impacts, as well as by the failure by NMFS and FWS to critically examine the effects of the Project on threatened and endangered species.

20.    Mr. Tesvich submitted comments on the Draft EIS, arguing that the MBSD Project will cause extensive, permanent harm to oyster beds and the delicate Barataria Basin ecosystem in exchange for uncertain, temporary benefits.

21.    The legal violations alleged in this Complaint, traceable directly to the Army Corps, NMFS, and FWS's conduct, cause concrete injury to Mr. Tesvich's aesthetic, professional, recreational, and wildlife preservation interests, including by adversely affecting the health and behavior of ESA-listed sea turtles and birds, as well as other wildlife that Mr. Tesvich enjoys observing and otherwise benefits from. These actual, concrete interests have been, are currently being, and, absent relief from this Court, will continue to be adversely and irreversibly injured by the Army Corps, NMFS, and FWS's failure to comply with federal law. Relief from this Court, including vacatur of the challenged permit, EIS, BiOp, and concurrence, pending full compliance with the APA, NEPA, the ESA, and other legal requirements, will remedy Plaintiff's injuries because such relief would mean that the Army Corps, NMFS, and FWS must fully consider the direct, indirect, and cumulative impacts of their actions on the

environment, as well as the adverse effects of their actions on endangered and threatened species. As a result of this reconsideration, the agencies may implement alternatives to the Project with fewer adverse environmental impacts.

## EARTH ISLAND INSTITUTE

22.    Earth Island Institute ("EII") is a non-profit, public interest organization headquartered in Berkeley, California. EII's mission is to support environmental action projects and build the next generation of environmental leaders in order to achieve solutions to environmental crises threatening the survival of life on Earth. Through its fiscally-sponsored projects and programmatic work, EII has worked to combat marine pollution, restore vulnerable coastal ecosystems, and protect marine life from myriad harms. EII also regularly publishes a magazine, the Earth Island Journal, to inform and empower action both in print and through daily online postings by providing tough investigative news coverage of crucial environmental issues worldwide. EII brings these claims on behalf of itself, its members, and two fiscally-sponsored projects, the International Marine Mammal Project ("IMMP") and the ALERT Project.

  a. **IMMP** is a fiscally-sponsored project of EII. IMMP staff are employees of EII. Since 1982, the International Marine Mammal Project ("IMMP") has been a global leader in protecting ocean habitats. IMMP has had numerous successful campaigns, including pioneering the Dolphin Safe tuna fishing standard, which stopped many tuna companies from chasing and netting dolphins when fishing for tuna and prevents tens of thousands of dolphin deaths annually. These standards also protect sea turtles by requiring the release of live netted animals and by forbidding the use of gillnets to catch tuna due to the high bycatch of dolphins and sea turtles. IMMP continues to monitor more than 800 tuna companies to ensure

they do not engage in this destructive fishing method. IMMP also fights against pollution and plastics in the ocean, particularly the entanglement of marine life in fishing gear. IMMP has a long history of advocating for the protection of marine sea turtles, including by campaigning to prevent the construction of a proposed industrial salt plant within the El Vizcaino Wildlife Preserve in Baja, the largest wildlife refuge in Latin America. The contaminants that would have been released from the salt plant are known to be highly toxic to endangered sea turtles. IMMP and its members likewise have significant interests in the protection of marine and coastal habitat from pollution and contamination. IMMP has a long history of opposing offshore oil drilling along the coast of the US and the Bahamas due to the release of toxic chemicals and accidental spills. IMMP has also supported establishment of marine sanctuaries and similar protected havens for wildlife, including threatened and endangered species.

b. **The ALERT Project** is a fiscally-sponsored project of Earth Island Institute. ALERT Project staff are employees of EII. ALERT works collaboratively with at-risk communities to reduce toxic exposures from oil-chemical activities, and to build a healthy energy future globally. Through its Director, Riki Ott, MSc, PhD, ALERT (and EII) has deep ties to the Barataria Basin and its wildlife. Through her work at EII, Dr. Ott embedded for a year in Gulf coast communities to coach residents and fishermen how to mitigate the long-term social, economic, environmental, and physical harm from the 2010 BP Deepwater Horizon oil disaster, drawing upon on her 20-year first-hand experience in the aftermath of

the 1989 *Exxon Valdez* oil spill as an Alaskan commercial salmon fisherwoman with academic training in marine toxicology. She author of two books on the oil spill's long-term harm. Dr. Ott used the Barataria Basin as her base camp during this time, networking with coastal fishing families and organizations across the four oil-impacted states (AL, FL, MS, LA). In between tours and community engagement efforts, Dr. Ott would seek the solitude of the Barataria Preserve of Jean Lafitte National Historical Park and Preserve to nurture and recharge her spirit, and spend time with her host family in Barataria with backyard cookouts and stories from the bayous. Through 2017, Dr. Ott continued to travel to Gulf coast communities bi-annually to document the emerging human health tragedy. Dr. Ott also responded to requests to help those along the Gulf coast to understand the dangers of environmental contaminants, particularly those emitted during the oil refining process. This work eventually expanded and evolved to become its own project, ALERT. A key part of ALERT's mission is to provide accessible science to empower frontline citizens, municipalities, state and federal agencies and Tribes to reduce toxic exposures in frontline communities. For example, among its many services, ALERT offers a Toxic Trespass Training program, co-written and developed by, with, and for people in Gulf coast communities to understand the connection between environmental and human health, use scientific information, and work together in a community-driven process to identify solutions and take actions to improve their own health and wellbeing.

c. ALERT works collaboratively with at-risk communities to reduce toxic exposures from oil-chemical activities, protect the health of oil spill response workers and the public, and build a healthy energy future. The organization focuses on educating the public about toxic exposures, engaging people and states in community oil spill prevention and response planning, and developing safe and effective oil spill response regulations. ALERT spearheaded two multi-year efforts with Gulf coast states and other allies to petition, then successfully sue, the EPA to update the rules governing use of chemical dispersants during oil spills, *See ALERT/EII, Inc. v Wheeler et al.*, Civ. No. 3:20-cv-00670-WHO (N.D. Cal. 2021), and to petition OSHA to provide greater protection for oil spill response workers, *see* ALERT, *OSHA petition to change recordkeeping rule 29 CFR 1904.5(b)(2)(viii)* (2023). ALERT has over 1,800 constituents across the United States, including Alaska, the western Great Lakes, and the U.S. Gulf Coast (including the area impacted by the MBSD Project), that receive ALERT's information and tools.

23. Through IMMP, EII submitted comments on the Draft EIS. Although EII supports projects to restore the Barataria Basin, it opposes the MBSD Project "given the inevitable and devastating impact[s]" the Project will have on the basin's wildlife, in particular the Barataria Bay Estuarine System stock of bottlenose dolphins, endangered sea turtles, endangered birds, and damage to the ecosystem.

24. EII's members have diverse connections with and interests in the waters and habitats impacted by the MBSD Project, including aesthetic, economic, recreational, physical,

and spiritual interests. EII's members have significant, concrete interests in waterways and human environments that are free from contaminants and safe for humans and wildlife alike to live in and enjoy. Relevant here, many of its members live in and/or regularly visit the Gulf Coast, including the areas surrounding the Barataria Basin. EII's members undertake recreational and professional activities in those areas, such as hiking, wildlife viewing, wildlife photography, boating, and fishing. Members derive health, aesthetic, recreational, inspirational, spiritual, scientific, and educational benefits from their activities within and on the waters of the Barataria Basin, including in the area impacted by the MBSD Project. EII's members actively work and advocate for the preservation and protection of the Gulf coast and its delicate ecosystems, as well as for the protection and conservation of the wildlife that depend on those habitats. Those members intend to continue to use and enjoy the Barataria Basin frequently and on an ongoing basis in the future, and have concrete plans to return to the affected areas. The areas of the Barataria Basin that Petitioners' members intend to continue to use and enjoy include specific areas where threatened and endangered birds and sea turtles are likely to be found.

25.     EII's members who live, visit, and work on and near the Barataria Basin are concerned with the risks posed to the basin and its wildlife by the MBSD Project. In particular, EII's members are concerned with the risks to fisheries, water quality, and ecosystems from the influx of contaminated Mississippi River water, the disturbance of contaminated soil, and contaminant releases and spills. For example, increased contamination of the basin environment will cause serious adverse effects to the fish and shellfish harvested by commercial, recreational, and subsistence fishers. Increased contamination will also have serious adverse effects on the

Barataria Basin's wildlife, including endangered and threatened species, and habitats in which EII's members have aesthetic, economic, spiritual, recreational, and professional interests.

26.     The legal violations alleged in this Complaint, traceable directly to the Army Corps, NMFS, and FWS's conduct, cause concrete injury to the aesthetic, professional, conservation, recreational, scientific, educational, and wildlife preservation interests of EII's members, including by adversely affecting the health and behavior of ESA-listed sea turtles and birds, as well as other wildlife that members enjoy observing and otherwise benefit from. These actual, concrete interests of EII's members have been, are currently being, and, absent relief from this Court, will continue to be adversely and irreversibly injured by the Army Corps, NMFS, and FWS's failure to comply with federal law. Relief from this Court, including vacatur of the challenged permit, EIS, BiOp, and concurrence, pending full compliance with the APA, NEPA, the ESA, and other legal requirements, will remedy Plaintiff's injuries because such relief would mean that the Army Corps, NMFS, and FWS must fully consider the direct, indirect, and cumulative impacts of their actions on the environment, as well as the adverse effects of their actions on endangered and threatened species. As a result of this reconsideration, the agencies may implement alternatives to the Project with fewer adverse environmental impacts.

## DEFENDANTS

27.     The Army Corps is a federal agency within the United States Department of Defense. The Army Corps is responsible for issuing permits under Section 404 of the Clean Water Act to authorize the discharge of dredged of fill material into all waters of the United States, including wetlands, as well as permits under Section 10 of the Rivers and Harbors Act to authorize the construction of any structure in or over any navigable water of the United States.

Accordingly, the Army Corps is ultimately responsible for the actions challenged in this Complaint.

28.    FWS is a federal agency within the United States Department of the Interior. FWS is responsible for the implementation of the ESA with respect to species under its jurisdiction. Accordingly, FWS is responsible for the actions challenged in this lawsuit.

29.    NMFS is a federal agency within the United States Department of Commerce. NMFS is responsible for the implementation of the ESA with respect to species under its jurisdiction. Accordingly, NMFS is responsible for the actions challenged in this lawsuit.

**STATUTORY AND REGULATORY FRAMEWORK**

**A.    The National Environmental Policy Act**

30.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[1] At the most basic level, NEPA is intended to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens *before* decisions are made and before actions are taken." *Id.* § 1500.1(b)-(c) (emphasis added).

---

[1] The Council on Environmental Quality ("CEQ") first promulgated regulations implementing NEPA in 1978, *see* 43 Fed. Reg. 55,978 (Nov. 29, 1978), followed by a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986). More recently, CEQ published a new rule, effective September 14, 2020, which further revised the 1978 regulations. However, the NEPA analysis challenged here arose prior to the 2020 amendments and is therefore governed by the 1978 regulations, as amended. *See* FEIS at 1-2. Thus, Plaintiffs cite throughout to the regulations as previously codified at 40 C.F.R. Parts 1500-1508.

31.     The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—is charged with administering NEPA, and has promulgated regulations implementing the Act that are "binding on all federal agencies." *See id.* § 1500.3; *see also id.* §§ 1500-1508.

32.     Under NEPA, federal agencies are required to consider the potential environmental impact of *all* agency actions. 42 U.S.C. §§ 4321-4347. The touchstone of NEPA is the EIS; federal agencies must prepare an EIS for any "major Federal action significantly impacting the quality of the human environment." *Id.* § 4332(c). An EIS ensures that all potentially significant environmental effects have been considered and disclosed to the public *during* the decision-making process. 40 C.F.R. §§ 1501.2, 1502.5.

33.     Within the EIS itself, federal agencies must identify and disclose all direct, indirect, and cumulative impacts of the proposed action, consider a reasonable range of alternative actions and their potential impacts, and disclose all irreversible and irretrievable commitments of resources attributable to the action. 42 U.S.C. § 4332(2). CEQ has deemed the alternatives analysis "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

34.     The agency's identification and disclosure of all potential impacts (and the alternatives thereto) are commonly referred to as the agency's duty to take a "hard look" at the environmental impacts of its decision. The three kinds of effects ordinarily discussed in an EIS are "direct effects," "indirect effects," and "cumulative impacts." 40 C.F.R. §§ 1502.16, 1508.7,

1508.8.[2] "Direct effects" are those "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). "Indirect effects" are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative impacts are those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. When analyzing the impacts of a proposed action, NEPA regulations require an agency to include information "relevant to reasonably foreseeable significant adverse impacts" in an EIS if it is "essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant." 40 C.F.R. § 1502.22(a).

35.    NEPA also requires consideration in an EIS of multiple types of actions, including "connected actions" and "cumulative actions." *Id.* § 1508.25(a). "Connected actions" are those that "are closely related and therefore should be discussed in the same impact statement"; actions are connected if they: (i) "Automatically trigger other actions which may require environmental impact statements"; (ii) "Cannot or will not proceed unless other actions are taken previously or simultaneously"; or (iii) "Are interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1508.25(a)(1). "Cumulative actions" are those that when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." *Id.* § 1508.25(a)(2).

---

[2] "Effects and impacts as used in [NEPA's implementing] regulations are synonymous." 40 C.F.R. § 1508.8.

36.    To fully explain the potential effects of alternatives in an EIS, NEPA requires federal agencies to evaluate all "appropriate mitigation measures" adopted to alleviate identified impacts from the proposed action, and identify any additional "[m]eans to mitigate adverse environmental impacts." *Id.* §§ 1502.14(f); 1502.16(h).

**B.**    **The Endangered Species Act**

37.    Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531. The ESA reflects "an explicit congressional decision to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

38.    Under the ESA, a species may be listed as endangered or threatened. An endangered species—a status which is reserved for species in the most perilous condition—is one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

39.    Section 9 of the ESA makes it unlawful for any person to "take" an endangered species without express authorization from FWS. 16 U.S.C. § 1538(a)(1). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" is further defined by FWS

regulations to encompass habitat modification or degradation that injures an endangered species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering, *see* 50 C.F.R. § 17.3, and "harass" is defined as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." *Id.*

40.     Section 7(a)(1) of the ESA directs all federal agencies, in consultation with the Secretary of Interior, to "utilize their authorities . . . by carrying out programs for the conservation of endangered species." 16 U.S.C. § 1536(a)(1). "Conservation" means "to use and the use of all methods and procedures which are necessary to bring any endangered species . . . to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3).

41.     Section 7(a)(2) of the ESA further requires all federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). To carry out this obligation, before undertaking any action that may have direct or indirect effects on listed species, an action agency must engage in consultation with FWS and/or NMFS ("the Services") in order to evaluate the impact of the proposed action. *See id.* § 1536(a).[3] The Services have

---

[3] A 1974 Memorandum of Understanding ("MOU") between FWS and NMFS defines each agency's jurisdiction with respect to listed species subject to the ESA. Pursuant to the MOU, FWS has jurisdiction over all terrestrial mammals, walruses, birds, reptiles (except marine turtles), and all other species which either (i) spend the major portion of their lifetimes on land and/or in fresh water; or (ii) are species which spend part of their lifetimes in estuarine waters, if the major portion of the remaining time is spent on land and/or in fresh water. NMFS has jurisdiction over cetaceans (e.g., whales and dolphins), all other pinnipeds (e.g., seals and sea

defined the term "action" for the purposes of Section 7 broadly to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," 50 C.F.R. § 402.02, "in which there is discretionary federal involvement or control," *id.* § 402.03. The Services have defined "effects of the action" to include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* § 402.02. Such effects "may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.*

42.     The purpose of consultation is to ensure that the action at issue "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated] habitat of such species." 16 U.S.C. § 1536(a)(2). As defined by the ESA's implementing regulations, an action will cause jeopardy to a listed species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Notwithstanding this definition of jeopardy, during consultation the action agency and the Services must consider not only the loss of critical habitat necessary to survival, but also the loss of critical habitat necessary to recovery of a listed species. The evaluation of the effects of the

---

lions), commercially harvested estuarine mollusks and crabs, and all other nonmammalian species (except birds, amphibians, and reptiles other than marine turtles), which either (i) reside the major portion of their lifetimes in marine waters; or (ii) are species which spend part of their lifetimes in estuarine waters, if where the major portion of the remaining time is spent in marine waters.

proposed action on listed species during consultation must use "the best scientific . . . data available." 16 U.S.C. § 1536(a)(2).

43.    Consultation under Section 7(a)(2) may be "formal" or "informal" in nature. Informal consultation is "an optional process" consisting of all correspondence between the action agency and the Services, which is designed to assist the action agency, rather than the Services, in determining whether formal consultation is required. *See* 50 C.F.R. § 402.02. During an informal consultation, the action agency requests information from the Services as to whether any listed species may be present in the action area. If listed species may be present, the action agency is required by Section 7(c) of the ESA to prepare and submit to the appropriate Service (the "consulting agency") a "biological assessment" ("BA") that evaluates the potential effects of the action on listed species and critical habitat. As part of the BA, the action agency must make a finding as to whether the proposed action may affect listed species and submit the BA to the consulting agency for review and potential concurrence with its finding. 16 U.S.C. § 1536(c). If the action agency finds that the proposed action "may affect, but is not likely to adversely affect" any species listed species or critical habitat and the consulting agency concurs with this finding, then the consultation process is terminated. 50 C.F.R. § 402.14(b).

44.    On the other hand, if the action agency finds that the proposed action "may affect" listed species or critical habitat by having any potentially adverse effect that may occur and is not insignificant or discountable, then formal consultation is required. *See* 50 C.F.R. § 402.11. Following completion of the BA, the action agency must initiate formal consultation through a written request to the consulting agency. *See* 50 C.F.R. § 402.14(c). The result of a formal consultation is the preparation of a biological opinion ("BiOp") by the consulting agency,

which is a compilation and analysis of the best available scientific data on the status of the species and how it would be affected by the proposed action. When preparing a BiOp, the Services must: (1) "review all relevant information;" (2) "evaluate the current status of the listed species;" and (3) "evaluate the effects of the action and cumulative effects on the listed species or critical habitat." *Id.* § 402.14(g). Additionally, a BiOp must include a description of the proposed action, a review of the status of the species and critical habitat, a discussion of the environmental baseline, and an analysis of the direct and indirect effects of the proposed action and the cumulative effects of reasonably certain future state, tribal, local, and private actions. *Id.*

45.     At the end of the formal consultation process, the consulting agency issues either a no-jeopardy or a jeopardy BiOp. With a no-jeopardy BiOp, the consulting agency determines that the proposed action is not likely to jeopardize the continued existence of listed species or adversely modify critical habitat. If, as part of a no-jeopardy BiOp, the consulting agency determines that the proposed action will nevertheless result in the incidental taking of listed species, then the consulting agency must provide the action agency with a written Incidental Take Statement ("ITS") specifying the "impact of such incidental taking on the species" and "any reasonable and prudent measures ["RPMs"] that [FWS] considers necessary or appropriate to minimize such impact" and setting forth "the terms and conditions . . . that must be complied with by the [action] agency . . . to implement [those measures]." 16 U.S.C. § 1536(b)(4). Take in excess of that authorized by the ITS violates the ESA's prohibition on take. *Id.* § 1538.

46.     With a jeopardy BiOp, the Services may offer the action agency reasonable and prudent alternatives to the proposed action that will not result in jeopardy to a listed species or adverse habitat modification, if they exist. *Id.* § 1536(b)(3)(A). 21. Where a BiOp has been

issued and "discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency is required to reinitiate consultation with the consulting agency in certain circumstances, including: (1) "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or (2) "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the [BiOp]." 50 C.F.R. § 402.16(a)(2), (3). Additionally, consultation must be reinitiated if, over the course of the action, the amount or extent of incidental take is exceeded. *Id.* § 402.16(a)(1).

47.    The ESA provides that agencies must hold action in abeyance until any legally required consultation is complete. Section 7(d) of the ESA prohibits an action agency from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate [Section] (a)(2)." 16 U.S.C. § 1536(d). "This prohibition . . . continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09. The purpose of this requirement is to ensure that the status quo will be maintained during the consultation process.

C.    **The Administrative Procedure Act**

48.    Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

49.    When reviewing agency action under the APA, the court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

## FACTUAL BACKGROUND

### A.    The 2010 Deepwater Horizon Oil Spill

50.    On April 20, 2010, a series of human and mechanical failures culminated in an explosion that tore through the Deepwater Horizon oil drilling rig, tragically killing eleven people. The explosion caused the rig to sink and oil to gush from the seabed, nearly 5,000 feet below the surface, for months until the well finally was capped in mid-July 2010. The result was the largest oil spill in the history of the United States and a cleanup and containment effort that, at its height, enlisted 50,000 workers on land and sea.

51.    After drilling a new well, the Deepwater Horizon crew performed steps to temporarily "abandon" the recently drilled well to allow for installation of production equipment to extract oil and gas. However, the drilling team did not properly install a surface cement plug to keep oil and gas below the seafloor. As the team proceeded to remove drilling fluid, the pressure levels decreased in the well and allowed oil and gas to erupt through the failed cement

26

barrier and onto the drilling rig floor, causing a well blowout. Worse, the well control systems that were intended to act as emergency mechanisms to prevent well blowouts failed, allowing oil and gas to gush into the Gulf of Mexico until engineers developed and installed a new containment system months later.

52.    Over the eighty-seven days during which the well remained uncapped, more than 130 million gallons of oil and unquantified amounts of natural gas flowed freely into the Gulf. The spill contaminated over 43,000 square miles of ocean waters and over 1,300 miles of shoreline in the Gulf. Scientists estimate the spill caused death or serious harm to billions, if not trillions, of animals, including over 100,000 individuals of species listed as threatened or endangered under the ESA.

53.    The spill marred coastal, ocean bottom, and midwater habitats, causing severe damage to the ecosystems that support the Gulf of Mexico's biodiversity and economy. In response to the spill, government officials had to close over 88,000 square miles (over one-third of the Gulf) to commercial and recreational fishing, portions of which remained closed for over a year after the spill.

54.    The heaviest oiling from the spill occurred in the Barataria Basin, resulting in substantial injuries to natural resources in the Basin. The impact of those injuries was intensified by the fragile nature of the Barataria Basin. Already suffering from significant coastal erosion, the Basin's marshes were heavily contaminated by oil, causing double or triple the rate of loss compared to other affected marshes.

55.    The harms from the spill to marine and coastal species, the environment, and the Gulf economy persist to this day.

**B.**     <u>**Natural Resources Damages Assessment**</u>

56.     The Oil Pollution Act ("OPA") addresses preventing, responding to, and paying for oil pollution incidents in the navigable waters, adjoining shorelines, and exclusive economic zone of the United States. Pursuant to the OPA, the party responsible for causing an oil spill—called a "responsible party"—is liable for the removal costs, as well as six specified categories of damages. The purpose of restoration is to make the environment and the public whole for injuries resulting from the spill by implementing restoration actions that return injured natural resources and services to the condition they would have been in but for the spill, and to compensate for interim losses.

57.     The process for assessing injuries caused by an oil spill, developing restoration plans to address those injuries, and implementing the restoration plans is called the "Natural Resources Damages Assessment ("NRDA") process." The governmental entities with jurisdiction over resources—federal, state, and tribal—are the Trustees throughout the NRDA process. Under the OPA, the function of the Trustees is to act "on behalf of the public" to assess natural resource damages, as well as to "develop and implement a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their trusteeship." The Trustees' work occurs in three steps: (1) a Preassessment Phase, during which the Trustees initially establish whether there is jurisdiction under the OPA and whether restoration of the damaged resources is appropriate; (2) the Restoration Planning Phase, during which the Trustees quantify the damages to resources caused by the oil spill, identify possible restoration projects, and develop a restoration plan that includes specific projects for remediation, which in turn, must include a "consider[ation of] a reasonable range of restoration

28

alternatives before electing the[] preferred alternative"; and (3) the Restoration Implementation Phase, during which the Trustees facilitate the implementation of the selected restoration projects.

58.    As an oil pollution incident, the Deepwater Horizon spill was subject to the provisions of the OPA. Following the disaster, a council of federal and state Trustees was established to assess the natural resource injuries resulting from the spill, and to develop and implement restoration plans to address those injuries.

59.    As required under the OPA, the Trustee Council conducted a NRDA process. Given the scale of the spill and resulting injuries, on February 19, 2016, the Council first issued a Programmatic Damage Assessment and Restoration Plan, which was intended to provide long-term direction for restoring the full suite of injured natural resources and services. Instead of identifying specific restoration projects, the Programmatic Plan provides direction and guidance for identifying, evaluating, and selecting future restoration projects to be carried out by Trustee implementation groups as restoration funds become available.

60.    In April 2016, this Court entered a Consent Decree resolving natural resource damage claims against BP Exploration and Production Inc. ("BP") by federal and state Trustees. *See* Consent Decree, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, MDL No. 2179, 2016 WL 1394949 (E.D. La. Apr. 4, 2016). Pursuant to the settlement agreement, BP agreed to pay (over a 15-year period) up to $8.1 billion in natural resource damages, and up to an additional $700 million for adaptive management or to address injuries to natural resources that were then unknown but may come to light in the future. The

decree specified thirteen restoration project types suitable for funding using settlement funds, and allocated a specific amount to each type for every Trustee.

61.    In Louisiana, the NRDA process is managed by the Louisiana Trustee Implementation Group ("LA TIG"), a group of federal and state agency representatives. Restoration work in the state focuses on restoring wetlands, coastal, and nearshore habitats, restoring water quality and habitat, and replenishing and protecting wildlife and marine resources, such as sea turtles, dolphins, birds, and oysters. To the extent practicable, the LA TIG works to implement restoration projects that are consistent with the Louisiana Coastal Master Plan.

**C.    The Mid-Barataria Sediment Diversion**

62.    The MBSD Project purports "to restore for injuries caused by the [Deepwater Horizon] oil spill by implementing a large-scale sediment diversion in the Barataria Basin that will reconnect and re-establish sustainable deltaic processes between the Mississippi River and the Barataria Basin through the delivery of sediment, fresh water, and nutrients." The Project is also intended to "support the long-term viability of existing and planned coastal restoration efforts." The Draft EIS further explains that the Project "is needed to help restore habitat and ecosystem services injured in the northern Gulf of Mexico as a result of the [Deepwater Horizon] oil spill."

63.    The MBSD Project consists of a controlled sediment and freshwater intake diversion structure on the Mississippi River in Plaquemines Parish and a conveyance system that is intended to convey sediment, freshwater, and nutrients from the Mississippi River to an outfall area within the mid-Barataria Basin in Plaquemines and Jefferson Parishes. Once operational, the

Project will discharge up to 75,000 cubic feet per second ("cfs") of freshwater, sediment, and nutrients into the mid-Barataria Basin when the Mississippi River flows are 450,000 cfs or greater. The entire Project construction footprint—including the Project operational footprint and temporary construction features that will not be maintained during Project operations—will encompass up to 1,376 acres, while the Project operational footprint will consist of 793 acres. Construction will occur over five years.

64.     On June 23, 2016, the Coastal Protection and Restoration Authority ("CPRA")— which was established after Hurricanes Katrina and Rita to prioritize and focus development efforts for coastal protection in Louisiana—submitted a Joint Permit Application to the Army Corps, pursuant to Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act, 33 U.S.C. §§ 403, 1344, for a permit to authorize activities related to the construction, operation, and maintenance of the proposed MBSD Project.

65.     In 2017, as part of the NRDA process, the LA TIG identified a large-scale sediment diversion project in the Barataria Basin as one restoration project that should move forward for detailed planning and analysis under the OPA. The LA TIG proceeded to evaluate the proposal under NRDA, including by examining alternatives such as marsh restoration. The LA TIG ultimately selected a large-scale sediment diversion as its preferred alternative for the strategic restoration of the Barataria Basin. In April 2017, the LA TIG issued a notice describing its decision to support the development of a single EIS for the MBSD Project to satisfy the obligations of both the LA TIG federal Trustees and Army Corps under the OPA, NEPA, and other environmental statutes.

66.    In 2018, Congress granted the MBSD Project a legislative waiver of the requirements of the Marine Mammal Protection Act, provided that the Project "(1) to the extent practicable and consistent with the purposes of the project[], minimize[s] impacts on marine mammal species and population stocks; and (2) monitor[s] and evaluate[s] the impacts of the project[] on such species and population stocks." Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 20201, 132 Stat. 64, 73.

67.    The MBSD Project is a "covered project" under Title 41 of the Fixing America's Surface Transportation Act ("FAST-41"). FAST-41 established new coordination and oversight procedures for certain infrastructure projects, ostensibly to improve timeliness, predictability, and transparency of the federal environmental review process. Covered projects are subject to an integrated permitting timetable that contains all federal environmental reviews and authorizations required for the project, is publicly posted on the Permitting Dashboard, and can only be modified in compliance with certain consultation and public disclosure requirements.

**D.    ESA-Listed Species In The Action Area**

68.    The MBSD Project's action area overlaps with the ranges of several species listed as threatened or endangered under the ESA, as well as with designated and proposed critical habitat for several of those species.

69.    Listed as threatened since 1985, the piping plover is a small migratory shorebird that nests and feeds along coastal sand and gravel beaches in North America. There are three recognized sub-groups of piping plover: one subspecies that is split into the Great Lakes population and the Northern Great Plains population; and the Atlantic Coast subspecies. Both the Atlantic Coast and Northern Great Plains populations are known to occur within the analysis area

for the MBSD Project. The recovery plans for both populations identify the need to protect the piping plover and its habitat from contamination and degradation due to oil or chemical spills as key to ensuring the recovery of the species. Indeed, plover habitat across the United States is "at risk of contaminations due to spills or other releases" in connection with energy development.

70.     No critical habitat has been designated for the Atlantic Coast piping plover population. Critical habitat for wintering piping plovers of the Northern Great Plains population was designated on July 10, 2001. Within Louisiana, FWS designated seven critical habitat units. The analysis area for the MBSD Project overlaps several of these units, including the coastal shoreline and barrier islands extending from the western edge of the analysis area east to the Grande Terre Islands, as well as certain barrier islands in the Birdfoot Delta.

71.     Listed as threatened in 2015, the red knot is a robin-sized shorebird that boasts one of the longest-distance migrations in the animal kingdom: more than 9,300 miles from south to north. The red knot breeds in the central Canadian arctic and is found in Louisiana during its spring and fall migrations in the winter months. During migration and on their wintering grounds, red knots forage along sandy beaches, tidal mudflats, salt marshes, and peat banks. The bird commonly feasts on bivalves, gastropods, and crustaceans. In July 2021, FWS proposed to designate 649,066 acres across thirteen states as critical habitat for the red knot. In response to comments, in April 2023, FWS proposed designating 683,405 acres across 127 units as critical habitat for the species. No changes were made to proposed critical habitat in Louisiana. Relevant here, FWS proposes to designate over 7,700 acres of the Barataria Barrier Islands and Headlands. Accordingly, much of the area proposed for critical habitat in Louisiana overlaps the MBSD Project's analysis area.

72.     Listed as endangered in 1970, the Kemp's ridley sea turtle is the smallest of the sea turtles, with adults reaching about 2 feet in length and weighing up to 100 pounds. Juvenile Kemp's ridleys associate with floating *Sargassum* seaweed, using the island-like seaweed masses as an area of refuge, rest, and a place to feed on small animals and plants. Once the juveniles reach a length of approximately eight inches, they migrate to nearshore areas of the Gulf of Mexico or northwestern Atlantic Ocean. After recruiting to shallow coastal areas, adult Kemp's ridleys feed primarily on crustaceans; however, they also scavenge on discarded bycatch.

73.     The loggerhead sea turtle was listed as threatened in 1978. Hatchlings and juveniles spend the first 7 to 15 years of their lives in the open ocean. They then migrate to nearshore coastal areas where they will forage and continue to grow for several more years. Adult loggerhead turtles migrate hundreds to thousands of kilometers from their foraging grounds to their nesting beaches. Loggerheads are opportunistic predators that consume mostly benthic organisms, including mollusks and crabs. Marine pollution—including contamination from herbicides, pesticides, oil spills, and other chemicals—poses a significant threat to loggerheads. Indeed, loggerhead turtles have been found to have high levels of organochlorine pesticides and heavy metals in their tissues as compared to other turtle species.

74.     In 1978, the green turtle was listed as threatened under the ESA. Green turtles are the only herbivorous species of sea turtle. Their diet mainly consists of algae and seagrasses, though they may also forage on sponges, invertebrates, and discarded fish. After emerging from the nest, hatchlings swim to offshore areas, where they live for several years in pelagic habitat. These pelagic juveniles forage on plant and animal life found in oceanic drift communities and are closely associated with pelagic *Sargassum* seaweed communities. *Sargassum* aggregates in

convergent zones where pollutants such as tar balls and plastics also accumulate. Due to their size, turtles in these stages are more vulnerable as a result of ingesting these contaminants. Juveniles eventually leave the open ocean habitat and travel to nearshore foraging grounds in shallow coastal habitats, where they mature to adulthood and spend the remainder of their lives. Green turtles are susceptible to mortality from fibropapillomatosis, a disease that causes tumor growth on soft external tissues, the carapace, the eyes, the mouth, and internal organs. These tumors can significantly affect the turtles' ability to swim and feed and can lead to death. Although the exact disease mechanism is unknown, it is thought to be related to both an infectious agent and environmental conditions, including exposure to pollution and other contaminants. The disease is most prevalent in green turtles and some evidence has linked the disease prevalence to degraded marine habitats. Indeed, green turtles in waters with high levels of pollution from agricultural and residential sources have a higher incidence of fibropapillomatosis compared to other nearby habitats such as the nearshore reefs.

**E.**     **Draft EIS**

75.     On March 5, 2021, the Army Corps issued a Draft EIS for the MBSD Project. The Draft EIS analyzed seven alternatives, including the No Action Alternative and the proposed Project.

76.     The MBSD Project has been controversial from its inception. The influx of riverine freshwater, sediment, nutrients, and contaminants into the Barataria Basin will have "moderate to major adverse impacts" on "plants and animals that are unable to tolerate the modified habitat, and subsequently, to the people that rely on the area plants and animals for economic, recreational, or other purposes." In other words, for the communities that were

devastated by the Deepwater Horizon spill in the first place, the MBSD Project only compounds the economic hardships stemming from that spill.

77.     To achieve the MBSD Project's stated larger purpose of restoring the Gulf coast, it is critical to develop a coordinated system of restoration strategies for land-building, including, as appropriate, diversions, marsh building/restoration, and shoreline armoring. Recognizing the importance of such an integrated approach, the Draft EIS defines the area of potential impacts (i.e., the "analysis area") to include the proposed MBSD diversion complex and outfall area, the Barataria Basin, and the Mississippi River Birdfoot Delta. Within the analysis area, there are several natural and man-made diversions that route water and/or sediment away from the River's main channel. Relevant here, Neptune Pass is a major channel on the Mississippi River south of the proposed MBSD Project intake. Between 2019 and 2022—the time period overlapping with the Army Corps' decisionmaking process for the MBSD Project—Neptune Pass enlarged from a narrow channel of approximately 150 feet to a natural crevasse nearly 850 feet wide, becoming the largest channel to open in the River in nearly a century. Neptune Pass now diverts over 118,600 cfs—16% of the Mississippi River's total flow—from the River into the shallow waters of Bay Denesse and Quarantine Bay. The indirect impacts of this 16% reduction in water and sediment flow downstream include, but are not limited to, changes in water quality; changes in bed elevations in the outfall area and downstream of the crevasse; increased land loss in the Birdfoot Delta; changes to wetland habitats and the aquatic species that depend on those habitats; impacts to navigation; and impacts to flooding.

78.     The Mississippi River is a dynamic and ever-changing deltaic environment with innate uncertainties. The ecosystem comprises "numerous interactions and feedback loops"

between various natural and physical processes, including water and sediment flows, vegetation

propagation, nutrient concentrations and flows, and hydrodynamics. These processes and

systems influence each other to regulate the Mississippi River Delta, and by extension, the plants

and wildlife that depend on the deltaic habitat. To make sense of such a complex system and

accurately predict future conditions, numerical models, including the Delft3D Basinwide

Modeling system, have been developed to simulate the "hydrodynamic, morphological, water

quality, and vegetation processes within the Mississippi River Delta system."[4]

79.     The Draft EIS uses the Delft3D Basinwide Modeling system to simulate and

predict existing and future conditions of the Mississippi River and Barataria Basin under each

MBSD Project alternative. The accuracy of the model's simulation is dependent on using

"[w]ell-defined boundary conditions," which define the model inputs. Relevant here, boundary

conditions in the Delft3D Model include the locations where water, sediment, and nutrients flow

into or out of the analysis area. Indeed, recognizing that the ultimate goal of the Project is to

build land and, further, that the Mississippi River carries a finite amount of water and sediment,

it is critical to parcel out the River's sediment budget between individual diversions to

understand the Project's impacts on the region. Accordingly, as the Draft EIS concedes, an

accurate accounting of "riverine input" both "into (*and out from*) the system" is "essential" to

generating a model simulation that accurately predicts future conditions in the Barataria Basin.

(Emphasis added). And those predictions—including predictions of changes in water quality,

salinity, and sedimentation—form the foundation of the Draft EIS's impacts analysis. Put

---

[4] Numerical models are mathematical models designed to predict the behavior of, or the outcome of, a real-world or physical system over time.

differently, without an accurate simulation of how freshwater, sediment, and nutrients are entering and leaving the River system, it is impossible to predict with any certainty the consequences to the Barataria Basin and its resources of adding yet another major diversion to the Mississippi River Delta system.

80.    To model the movement of water and sediment through the analysis area, the Delft3D Model incorporated boundary conditions defining water, sediment, and nutrient flows both into the system from freshwater inputs, and out of the Mississippi River through existing outlets. Specifically, the Delft3D Model included freshwater flows into the Barataria Basin from major rivers, as well as Mississippi River outflows from major natural and man-made diversions both upriver and downriver from the proposed MBSD Project location. The resulting simulation was used to calculate changes in water level, velocity, salinity, temperature, sediment and mineral deposition, and the evolution of the deltaic landscape over the 50-year analysis period as a result of the MBSD Project alternatives. As explained, these calculated changes in water quality and sedimentation were used as the basis for the Draft EIS's examination of the direct, indirect, and cumulative impacts of the MBSD Project alternatives on, *inter alia*, wildlife and habitat (including endangered and threatened species), socioeconomic factors, commercial fisheries, hazardous substances, and navigation.

81.    Despite the fact that "well-defined boundary conditions," including riverine input and output, are "essential" to ensuring the accuracy of the Delf3D Model—and, by extension, to the accuracy of the Draft EIS's impacts analysis—the Army Corps neglected to include in its model Neptune Pass, which as explained, now diverts 16% of the River's total flow. Consequently, significantly less freshwater and sediment are reaching areas downstream,

including the Birdfoot Delta. Yet, the Delft3D Model does not account for this significant outlet in its simulations. As a result, the model's baseline conditions—i.e., the starting point for the simulations of all the MBSD Project alternatives—fail to generate an accurate picture of water, sediment, and nutrient flow through the analysis area. This fundamental flaw seriously undermines the Draft EIS's impacts analyses. For example, using the simulations generated by the Delft3D Model, the Draft EIS explains that the MBSD Project alternatives will result in "permanent, moderate, and adverse" impacts on seabed elevations in the Birdfoot Delta because "sediment diverted into the Barataria Basin would not be available for potential land building in the [B]irdfoot [D]elta." Those changes in bed elevation and sediment transportation will, in turn, result in indirect and cumulative impacts to resources, "includ[ing] . . . changes in wetland habitats and the aquatic species that depend on these habitats, and impacts on flooding." However, because the Delft3D Model does not account for the 16% reduction in freshwater and sediment flow caused by Neptune Pass, the Draft EIS likely significantly underestimates the direct, indirect, and cumulative impacts on the Birdfoot Delta of adding another major man-made diversion to the sediment-starved River.

82.    The Draft EIS purports to examine the environmental impacts of the MBSD Project on the Barataria Basin. The Draft EIS acknowledges that the construction and operation of the MBSD Project "will likely increase contaminant levels in the [Barataria Basin] water from increased diversion of waters from the Mississippi River, runoff from adjacent agricultural lands, and spills of hazardous chemicals." However, the Draft EIS ultimately concludes that "[t]he movement of sediment from the Mississippi River to the Barataria Basin during operations of the [MBSD Project] is not expected to result in discernable or measurable impacts on sediment

quality in the Barataria Basin." To support this conclusion, the Draft EIS relies on "recent evaluations of Mississippi River sediments" performed for navigation channel maintenance that "indicate" that River sediments in the vicinity of the intake are "free from contaminants" in harmful concentrations. However, the Draft EIS acknowledges that those evaluations have "limited" applicability to the MBSD Project because they "do not provide sediment quality data for sediments that would necessarily be transported to the Barataria Basin via the proposed [MBSD] Project diversion structure." Moreover, the Draft EIS acknowledges that the evaluations examine the impacts of the "disposal of sediments into either the Mississippi River or an [ocean dredged material disposal site ("ODMS")] where currents, waves, and tides can rework or transport dispersed sediments and potentially aid in contaminant dilution." In contrast, the MBSD Project "is designed to deliver sediments to an area for deposition that has lower water energy conditions than the Mississippi River or an ODMDS and likely a significantly lower dilution potential." Accordingly, the Draft EIS acknowledges that the evaluations "consider dilution models that would likely require modification to be applicable to the Project outfall area." The Draft EIS does not explain why such modifications to the dilution models could not be made. Nor does the Draft EIS examine the cumulative effects to environmental resources that may result from the interactions within biological organisms between even relatively small concentrations of contaminants.

83.    The Draft EIS acknowledges that there are "known abandoned oil and/or gas waste pits in the immediate outfall area in the vicinity of the proposed beneficial use placement areas," and further, that the "[d]isturbance of potentially contaminated sediments" during the construction and/or operation of the Project "could result in the release of contaminants from

these pits into surface or groundwater in the vicinity of the Project area." The spread of those contaminants would, in turn, "result[] in minor to major, short to long-term adverse impacts over time." However, the Draft EIS's identification of potential hazardous waste sites within the Project area involved only visual observations and reviews of historical records; it "does not include sampling and analysis of soil or groundwater." Accordingly, the extent of existing contamination—and consequently, the risk to the environment posed by the disturbance of contaminated soils as a result of Project alternatives—remains unknown.

84.    The Draft EIS does not explain why such sampling could not be accomplished. In the absence of information regarding the presence and concentration of contamination in the Basin, the Draft EIS does not meaningfully consider the environmental impacts resulting from any sediment disturbance by MBSD Project alternatives. Nor does the Draft EIS meaningfully consider the impacts of such disturbances cumulatively with the effects of the influx of River contaminants into the Barataria Basin. Instead, the Draft EIS dismisses any meaningful discussion of the impacts resulting from disturbance of contaminated sites by insisting that adherence to spill prevention plans will "minimize" the impacts of contamination for all action alternatives. However, the prevention plans lack detail and fail to explain precisely how the risks presented by hazardous spills or the disturbance of contaminated sites will be "minimized." For example, the Mitigation and Monitoring Plan recommends that sampling of fish and shellfish from the outfall area be conducted "periodically" to detect contaminant concentrations in the food web. Yet, the Mitigation and Monitoring Plan does not contain any commitment to conduct such sampling. Nor does the plan offer any information about the methodology or even frequency of monitoring for hazardous spills or contaminated sites in the Barataria Basin.

85.    The Draft EIS purports to examine the environmental effects of spills of oil and other hazardous materials on the analysis area, noting that the MBSD Project, together with other projects in the Barataria Basin, "may result in an increased volume and frequency of spills of hazardous materials [and] temporary increases in turbidity and sedimentation." However, the Draft EIS again insists in its assessment of effects on various environmental resources, including wildlife, threatened and endangered species, and habitat, that "[i]mpacts from hazardous material spills and turbidity/sedimentation would be minimized and mitigated to the maximum extent practicable through best management practices required through" the permitting process, as well as "through implementation of each project's" prevention plans. Yet, the Draft EIS also acknowledges that "[b]etween 1991 and 2012, the Emergency Response Notification System database reported 192 releases of petroleum and hazardous substances within 1 mile of the proposed diversion structure and outfall area." Most of those releases were reported at the Alliance Refinery, which is less than a mile north of the proposed diversion structure. According to the EPA's Enforcement and Compliance History Report on the facility, since May 2023, Alliance Refinery has reported noncompliances with the Clean Water Act in seven of the last twelve quarters.[5] In fact, Alliance Refinery was "the worst [polluter] in the nation based on the amount of ammonia it released into the water" before it shuttered due to severe flooding during Hurricane Ida in 2021.[6] The hurricane damage also resulted in the release of an unknown amount of oil from the facility, after which observers reported over 100 oiled birds, as well as oiled otter

---

[5] EPA, Detailed Facility Report: COLONIAL PIPELINE CO - ALLIANCE STATION, https://bit.ly/3Cbe16F.

[6] Greg LaRose, *Louisiana refineries are among the top U.S. water polluters, report finds*, Daily Advertiser (Feb. 6, 2023), https://bit.ly/42lyL6l.

and deer.[7] Alliance Refinery has since been bought and converted to an oil and refined products terminal, raising the specter of additional future releases of petroleum products less than a mile from the MBSD intake.[8] Beyond this one facility, a recent study by the Environmental Integrity Project determined that eight facilities in Louisiana ranked among the top oil operations that pollute public waterways nationwide.[9] Refineries in south Louisiana were found to discharge some of the highest amounts of heavy metals, nitrogen, and other pollutants into rivers, estuaries, and other waterways. The Draft EIS does not discuss the potential for hazardous spills from Alliance Refinery or, indeed, from any facility on the Mississippi River. Nor does the Draft EIS discuss the potential for storm hazards to increase this risk. Instead, despite evidence to the contrary, the Draft EIS repeats the general assertion that adherence to permitting processes and prevention plans would "minimize" both the potential for hazardous spills, as well as any impacts from toxic spills and/or releases.

86.    The Draft EIS insists that the MBSD Project alternatives will likely have "negligible impacts on fauna from the influx of [R]iver contaminants." In support of this assertion, the Draft EIS relies on studies of changes in contaminant levels resulting from two freshwater diversions of the Mississippi River: the Caernarvon Diversion, which allows up to 8000 cfs of freshwater and sediment to flow from the Mississippi River to the Breton Estuary; and the Davis Pond Freshwater Diversion, which allows for up to 10,650 cfs of freshwater to

---

[7] Mark Schleifstein & Tristan Baurick, *Hurricane Ida oil spills 'mind-boggling,' but likely not as bad as Katrina, Rita,* NoLa.com (Sept. 13, 2021), https://bit.ly/3oHAEMV.
[8] Ruhi Soni, *UPDATE 1-Harvest to buy storm-hit refinery-turned-terminal from Phillips 66,* Reuters (Dec. 21, 2022), https://bit.ly/42rn9hS.

[9] Tristan Baurick, *Louisiana has 8 of the worst water-polluting refineries in the country, study says,* NoLa.com (Jan. 30, 2023), https://bit.ly/3MTeDTp.

flow from the Mississippi River into Lake Cataouatche, in the Upper Barataria Basin. However, these studies are largely inapposite to the situation presented by the MBSD Project. For example, both the Caernarvon and Davis Pond Freshwater Diversions are "substantially" smaller than the MBSD Project alternatives, and thus are of little relevance to the MBSD Project. Indeed, the Draft EIS admits that "the substantially larger outflow of the proposed [MBSD Project] diversion may result in increased contaminant levels in biota," beyond those observed in smaller diversions. Moreover, the Davis Pond and Caernarvon Diversions "are freshwater diversions designed to extract water from the top of the river and discharge primarily water, not sediment." Sediment is a known reservoir for many contaminants, including "legacy" contaminants (e.g., DDT and PCBs) and forever chemicals, as well as pesticides and fertilizers that are currently in use. Because many contaminants are found in sediment, these diversions are a poor analog for the MBSD Project, which is designed to transport large volumes of sediment to the outfall area. Accordingly, studies of freshwater diversions, which transport primarily water (as opposed to sediment) are of limited utility to predicting levels of contamination likely to result from a large-scale sediment diversion.

87.    The Draft EIS acknowledges that any increase in hazardous materials or contamination levels in the Barataria Basin will likely be "biomagnified through the food chain, increasing exposure to [species at] higher trophic levels" and causing deleterious effects in certain species. For example, the Draft EIS acknowledges that bald eagles are known to be susceptible to environmental contaminants through prey consumption, which historically has "resulted in eggshell thinning and, ultimately, reduced reproductive success." Although the Draft EIS asserts that there is "incomplete information" regarding the potential for increased

contamination from diverted Mississippi River water to affect bald eagles, it nevertheless acknowledges that "a diversion of this size would introduce agricultural runoff," and therefore, the MBSD Project "may lead to declines in water quality in the Barataria Basin and subsequent impacts [to] eagle food resources." The Draft EIS concludes that the MBSD Project alternatives would "have negligible to moderate, permanent, indirect, and adverse impacts on bald eagles." Yet, beyond acknowledging that the Project presents *some* level of risk to bald eagles on the scale of "negligible" (i.e., "barely noticeable") to "moderate" (i.e., "detectable"), the Draft EIS does not provide any meaningful qualitative or quantitative analysis of those risks. Instead, the Draft EIS again relies on studies conducted on the Davis Pond and Caernarvon Freshwater Diversions to dismiss the impacts of contamination on bald eagles, asserting that although the two freshwater diversions introduced river contaminants into their respective outfall areas, such contamination was "not to a level that would cause adverse effects to bald eagles." However, the Draft EIS's discussion of operational impacts on bald eagles does not explain the relevance of data regarding contamination resulting from the two freshwater diversions to the MBSD Project, which again, is significantly larger than either of the two freshwater diversions and is specifically designed to transport sediment, a known reservoir for many contaminants.

88.    The Draft EIS briefly discusses the impacts of increased contamination in the Barataria Basin on sea turtles, all species of which are protected under the ESA. The Draft EIS does not discuss the impacts of contaminants, including from bioaccumulation, on any other federally-listed species occurring within the analysis area. With respect to sea turtles, the Draft EIS reports that increases in contaminants in sea turtle prey and Barataria Basin habitat "could potentially increase the incidence of" certain diseases in individual sea turtles. However, the

45

Draft EIS again cites to the inapposite studies conducted on the Davis Pond and Caernarvon Freshwater Diversions to suggest that any potential impacts to sea turtles from contamination will be minimal. The Draft EIS concludes that "[i]ncreased contaminants may lead to additional health or other deleterious effects on sea turtles, the certainty and magnitude of which is unknown at this time." The Draft EIS does not explain why information concerning those impacts is unavailable or unobtainable. Nor does the Draft EIS explain what additional information could help clarify the effects. Instead, the Draft EIS insists that its analysis "use[s] the best available information" and "is sufficient to support sound scientific judgments and informed decisionmaking."

89.     The Draft EIS offers a cursory discussion of the cumulative impacts to Barataria Basin from spills, releases, and increased concentrations of contaminants. In essence, the Draft EIS acknowledges that the MBSD Project will likely result in an increase in contaminants in the Basin, yet at the same time, insists that the MBSD Project will "not directly, indirectly, or cumulatively impact [hazardous, toxic, and radioactive waste] in the Project area." Further contradicting itself, the Draft EIS acknowledges in the next sentence that "[p]otential cumulative impacts on water and sediment quality" may result "if spills were to occur from reasonably foreseeably industrial projects adjacent to the" Project area. The Draft EIS nevertheless insists that the cumulative impacts of "hazardous material spills and turbidity/sedimentation" from the MBSD Project and other past, present, and reasonably foreseeable future actions "would be minimized by implementation of the various projects'" best management practices required by their permits and/or prevention plans. The Draft EIS does not discuss the potential for multiple projects to disturb contaminated sites in the analysis area. Nor does it discuss the fact that many

46

of top polluters of waterways nationwide operate on in southern Louisiana, including one facility

less than a mile upriver from the proposed Project intake. Nor does it meaningfully discuss the

cumulative effects of contamination or hazardous spills on the wildlife and habitat in the analysis

area. For example, although the Draft EIS recognizes that the MBSD Project, together with other

planned sediment diversion projects in the analysis area such as the Mid-Breton Sediment

Diversion Project, could have significant, far-reaching adverse cumulative effects on bald eagles

"if contaminants in the [outfall areas] both increase and result in accumulated contaminants in

bald eagle prey," it defers analysis of those impacts to "forthcoming EIS[s]" for specific future

projects. Aside from a brief discussion of bioaccumulation in bald eagles—which are no longer

federally listed under the ESA—the Draft EIS's discussion of cumulative impacts on threatened

and endangered species does not even mention the potential for increased contamination from

multiple projects.

90.    The Draft EIS includes a BA (prepared by the Corps as part of its purported

compliance with the ESA) as an appendix. The BA largely regurgitates the Draft EIS's

discussion of sediment quality and concludes that "[b]ase levels of contaminants from the

Mississippi River are not anticipated to be detrimental to species or habitats of Barataria Basin or

the Birdfoot Delta." Like the Draft EIS, the BA acknowledges that the assessments upon which

this conclusion is based have "limited" applicability to the MBSD Project for the same reasons

described in the Draft EIS.

91.    The Draft EIS does not discuss the potential for contamination of the Barataria

Basin by plastics. Nor does the Draft EIS discuss the potential for contamination of the Basin

with per- and polyfluoroalkyl substances ("PFAS"), a group of manufactured compounds that are

known to be present in the Lower Mississippi, are highly toxic, and persist in the environment

for decades, earning them the moniker, "forever chemicals." PFAS are known to be hazardous to

human health at very low concentrations; exposure to the substances has been shown to cause,

among other ill effects, developmental delays, immunosuppression, increased cholesterol levels,

hormonal disruptions, and a heightened risk of testicular or kidney cancer. Elevated

concentrations of two of the most commonly used and studied PFAS compounds,

Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS"), in aquatic

ecosystems can result in death of aquatic organisms and affect their growth and reproduction.

The chemicals are also known to accumulate in the tissues of organisms, presenting the risk of

bioaccumulation at higher trophic levels. Accordingly, in 2009—well before the environmental

review process for the MBSD Project—the EPA issued provisional Drinking Water Health

Advisories ("Health Advisories") for PFOA and PFOS, which advised that to avoid adverse

health effects, individual or combined concentrations of PFOA and PFOS in drinking water

should be no more than 400 parts per trillion ("ppt").[10] The PFAS Health Advisories are intended

to serve as interim standards until the agency issues a legally enforceable National Primary

Drinking Water Regulation, and are expressly intended to guide decisionmakers while that

enforceable standard is being developed. Since 2009, the best available science regarding the

risks of PFAS exposure has evolved rapidly and evidence has shown that adverse health effects

---

[10] A Health Advisory identifies the concentration of chemicals in drinking water at or below which adverse health effects are not anticipated to occur. Unlike the legally enforceable maximum contaminant levels ("MCL") which is set forth in a National Primary Drinking Water Regulation promulgated pursuant to the Safe Drinking Water Act ("SDWA"), the contaminant concentrations provided in Health Advisories are based solely on EPA's assessment of the risks and are not based on any consideration of the feasibility, costs, or benefits of reducing contaminant levels.

emerge at much lower exposure levels than previously thought. Accordingly, in 2016, the EPA

issued revised Health Advisories for PFOA and PFOS establishing the health advisory level at 70

ppt. In June 2022, again responding to new evidence, the EPA issued final Health Advisories for

PFOA and PFOS. For PFOA, the final Health Advisories established the health advisory level at

0.02 ppt, while the health advisory level for PFOS was established at 0.004 ppt. Notably, the

EPA's final Health Advisory was issued prior to the publication of the Final EIS for the MBSD

Project

92.     The lower Mississippi River in particular is known to be highly contaminated

with PFAS. Indeed, a 2022 study by the Water Collaborative detected PFAS in Mississippi River

surface waters in several locations in Louisiana. At one site in Ascension Parish, the level of

PFOS exceeded the EPA's final Health Advisory limits in water by more than 26,000%.

**F.      Comments in Response to the Draft EIS**

93.     On June 3, 2021, Plaintiff Jurisich Oysters, LLC submitted comments on the

Draft EIS. Jurisich Oysters explained that the CPRA "overstated the benefits of the MBSD"

Project. For example, although CPRA "touts the MBSD [Project] as a re-creation of the natural

historical process of the [Mississippi] [R]iver's sediment dispersion," the diversion will take

River water containing "fertilizer runoff, pollutants, plastics and other waste" into the Barataria

Basin. These contaminants will have adverse effects on the Basin's ecosystem, and will

undermine the efficacy of the Project. Indeed, evidence suggests that "river diversions destroy

more wetlands than they save by sending harmful fertilizer nutrients into the wetlands which

overgrow vegetation and cause soil erosion." Moreover, because upriver dams in the Mississippi

River have significantly reduced the historical sediment flow, the MBSD Project will in fact

operate as "a freshwater diversion" and, consequently, "will destroy the brackish water ecosystem and destroy the natural habitat for brown shrimp, bottlenose dolphins, and oysters."

94.     Other members of the public submitted comments on the Draft EIS highly critical of the MBSD Project and the Draft EIS. For example, many commenters objected to the Draft EIS's cursory discussion of the MBSD Project's effects on contamination levels in Barataria Basin. Commenters explained that "because the dilution capacity of the [B]asin is less than that of the Mississippi River, contaminants routed to the [B]asin via the diversion would reach toxic levels because [B]asin waters would not sufficiently dilute the sediment." Moreover, recognizing that the information provided in the Draft EIS was incomplete, commenters recommended that "extensive studies be done . . . to evaluate the effect of the polluted Mississippi River [water and sediment] that would be redirected into Barataria Basin." Commenters likewise expressed concern that the Draft EIS inadequately discussed existing sources of contamination in Barataria Basin, including oil and gas wells and pipelines, and the impacts that the MBSD Project may have on those sources of ongoing environmental harms.

95.     Commenters objected to the Draft EIS's inadequate discussion of cumulative impacts on the analysis area's environmental resources as a result of contamination and hazardous spills from industrial facilities on the Mississippi River. For example, commenters expressed concern that the MBSD Project would allow for hazardous spills in the Mississippi River to flow into and pollute the Barataria Basin, adversely affecting wildlife, habitat, and public health. Commenters specifically noted that Alliance Refinery has "had past releases of petroleum and hazardous substances, hazardous waste violations under [RCRA], and as having

an active industrial landfill site, the [FEIS] should assess the potential for the facility to discharge contaminated substances into the Barataria [B]asin via diversion flows."

96.     Various commenters objected to the Draft EIS's cursory consideration of the MBSD Project's impacts on wildlife and habitat. For example, commenters objected to the Draft EIS's use of inapposite assessments of contamination resulting from the Davis Pond and Caernarvon Freshwater Diversions as analogs for its analysis of potential impacts to wildlife and habitat from the MBSD Project. Commenters also asserted that the Draft EIS inadequately addressed adverse impacts to threatened and endangered species, as well as to other special-status species such as bald eagles. Commenters requested that additional examination be conducted to determine the impacts of the Project on threatened and endangered species, including sea turtles. Commenters also argued that the Draft EIS omitted "in-depth discussion of mitigation measures outside of passing references to best management practices," and insisted that the Final EIS must include "detailed plans to mitigate adverse impacts to all endangered, threatened, and special-status species, including mitigation for impacts to the habitats of adversely affected [endangered, threatened, and special-status] species."

97.     Commenters expressed several concerns related to the accuracy of the Delft3D Model. For instance, commenters "expressed concern that there's not enough sediment in the [R]iver to achieve wetland and land creation goals of the proposed [MBSD] Project." Commenters also "expressed concern that models have not yet examined the cumulative impacts on flooding from multiple proposed diversions operating simultaneously." Other commenters asserted that the MBSD Project "would cause detrimental land loss in the [B]irdfoot [D]elta," resulting in serious adverse impacts to the delta and lower Plaquemines Parish.

98.     Commenters expressed concern that plastics and microplastics, "(including but not limited to PFAS) in the Mississippi River would be introduced into the [B]asin through the proposed MBSD diversion, causing adverse impacts on wildlife and humans." Commenters explained that "[p]lastics never fully disintegrate, they just get smaller and smaller." Those microplastics "harbor toxins and bacteria, especially in warmer waters." Likewise, PFAS "do not ever break down (earning the name 'forever chemicals'), and have been linked to horrendous side effects in living organisms."

**G.     Final EIS**

99.     In September 2022, the Army Corps issued the Final EIS for the MBSD Project. The Final EIS adopted the CPRA's preferred alternative and made few meaningful changes to the Draft EIS. For example, despite comments from Plaintiff Jurisich Oysters and others explaining that the MBSD Project will result in increased contamination in the Barataria Basin, the Final EIS asserted that the Draft EIS fully examined the impacts related to contamination and was sufficient to support the agency's decision. The Final EIS also disputed the commenters' characterization of the risks of discharging contaminated River water and sediment into the lower-energy Barataria Basin, arguing that the "dilution referenced in [the Draft EIS] refers to movement along the entire length of the [R]iver from Minnesota to Louisiana and is not meant to imply that dilution is occurring or needed to dilute elevated concentrations in the proposed Project area." The Final EIS does not attempt to square this assertion with its previous statements acknowledging that the MBSD Project "is designed to deliver sediments to an area for deposition that has lower water energy conditions than the Mississippi River or an ODMDS and likely a

significantly lower dilution potential," which may impact the ability of "currents, waves, and tides" to "rework or transport dispersed sediments and potentially aid in contaminant dilution."

100.    In response to comments objecting to the Draft EIS's use of freshwater diversions as analogs for the MBSD Project in its impacts analysis, the Final EIS added as an appendix a summary of select natural and man-made diversions in southeastern Louisiana that "compare[s] the purpose and/or characteristics of the[] diversions to the MBSD Project, and discuss[es] their recorded impacts on the natural environment." However, this summary does not meaningfully compare the impacts of freshwater diversions to those of the MBSD Project. Nor does it establish the applicability of the evaluations regarding the impacts of contamination resulting from freshwater diversions to the MBSD Project, which is much larger than the freshwater diversions evaluated and is designed to transport mainly sediment.

101.    The Final EIS likewise dismissed commenters' concerns regarding the Project's adverse effects on the Barataria Basin's wildlife, including threatened and endangered species, and species of special interest. For example, the Final EIS quibbles with the commenters' characterization of the likely impacts to bald eagles from the bioaccumulation of contaminants and touts the Mitigation and Monitoring Plan as sufficient to minimize any adverse effects. Specifically, the Final EIS reported that CPRA "agree[d] with [FWS's] recommendation to monitor for certain contaminants, (through sampling of fish, shellfish, and potentially bald eagle feces and blood) during diversion operations, if applicable." Although no changes were made to the Final EIS's discussion of adverse effects on wildlife (including protected species), the revised Mitigation and Monitoring Plan provided slightly more detail on CPRA's intentions to address contamination. Specifically, the plan reports that CPRA intends to develop a list of contaminants

of concern and conduct one "pre-operations sampling event to establish baseline concentrations of [identified contaminants] in sediment, fish, and shellfish" in the analysis area. Post-operations sampling "*may* be added after sufficient time for potential contaminants to accumulate."

102.    In response to commenters' concerns about the Draft EIS's analysis of the MBSD Project's impacts on land loss and bed elevation in the Birdfoot Delta, the Army Corps acknowledged that the MBSD Project will "result in an increased rate of [land] loss in the [B]irdfoot [D]elta" due to the diversion of sediment and water upriver. However, the Army Corps explained that the LA TIG "believes that the [MBSD Project] provides the right balance in terms of the likely benefits the Project would achieve and the risks related to collateral injury." The Army Corps did not acknowledge that the flaws in the Delft3D Model—specifically, the model's failure to incorporate Neptune Pass into its simulation—seriously undermine the accuracy of the Final EIS's predictions with respect to land loss in the Birdfoot Delta as a result of the Project. Instead, despite commenters' assertions that the Draft EIS failed to accurately examine the cumulative effects of the MBSD Project together with other natural and man-made diversions in the analysis area, the Final EIS insisted that the Delft3D Model took those diversions into account when projecting the baseline conditions and 50-year projections for the MBSD Project alternatives for hydrology, flooding, hydrodynamics, water quality, vegetation/wetlands, and other resources in the Project area. The Final EIS likewise dismissed comments explaining that the Mississippi River does not carry enough sediment to accomplish the Project's goals, asserting that the Delft3D Model "takes this diminished sediment load into account when computing the sediment that would be delivered to the Barataria Basin."

103.     Although the Final EIS purports to add discussion of "currently ongoing and future projected land loss and the amount of land that would be created, sustained, or lost due to" the Project, it does not revise the Delft3D Model to include the significant Neptune Pass outlet. This omission is particularly egregious because in September 2022—the *same month* as the Final EIS was issued—the Army Corps issued a Draft Environmental Assessment (a NEPA document) that purports to analyze the impacts of constructing a flow control feature in Neptune Pass to address navigational concerns related to the uncontrolled diversion. Although the Army Corps acknowledged in this Draft EA that Neptune Pass is currently diverting eight times more water than the other five adjacent outlets combined, and thus, clearly impacts the same resources as the MBSD Project, the Draft EA does not mention the MBSD Project. As explained, the Final EIS for the MBSD Project, which again, was issued *the same month* as the Army Corps' Draft Environmental Assessment for the Neptune Pass project, does not mention Neptune Pass at all.

104.     The Army Corps "acknowledge[d] that microplastics and PFAS in surface water are not currently regulated." The agency insisted that "[t]here are currently no data to determine whether PFAS concentrations in the Mississippi River are significantly different from concentrations in the Barataria Basin." However, beyond this conclusory statement, the Final EIS does not offer any explanation as to what data are required to conduct such a comparison, or why those data cannot reasonably be obtained. The agency further insisted that "[t]here are no standards to evaluate whether PFAS concentrations are unacceptably elevated in the [R]iver or the [B]asin." The Final FIS did not acknowledge that studies of PFAS levels in the Lower Mississippi have been conducted.

105.    The Final EIS did not acknowledge that since 2009—including during the time period overlapping with the Army Corps' decisionmaking process for the MBSD Project—the EPA has taken several actions to address PFAS contamination, including by issuing Health Advisories in 2009, 2016, and 2022, to guide decisionmakers while an enforceable National Primary Drinking Water Regulation is being developed. Moreover, in January 2021—before the Army Corps issued the Draft EIS—the EPA announced a strategic roadmap that set a timeline for specific actions the agency planned to take to regulate PFAS in order to better safeguard public health, protect the environment, and hold polluters accountable. As part of this commitment, in April 2022, the EPA issued Draft Aquatic Life Criteria for PFOA and PFOS, which establish acute and chronic exposure criteria for freshwaters. Shortly thereafter, in June 2022, the EPA issued its final PFAS Health Advisories establishing the health advisory levels for PFOA and PFOS at 0.02 ppt and 0.004 ppt, respectively.[11]

106.    In response to comments criticizing the Draft EIS's discussion of the potential cumulative "impacts of nearby industrial facilities on [R]iver water routed to the [B]asin during proposed Project operations," the Army Corps added a new section to the Final EIS ostensibly "clarifying the potential impacts of accidental spills of hazardous substances in the [R]iver during proposed Project operations." However, this new paragraph does not examine the impacts of such spills on environmental resources in the analysis area; rather, it explains the planned

---

[11] More recently, on March 14, 2023, the EPA announced its proposed National Primary Drinking Water Regulation to establish legally enforceable levels, called maximum contaminant levels, for six PFAS compounds, including PFOA and PFOS. For PFOA and PFOS, that concentration is proposed to be 4.0 ppt. The proposed regulation would also require public water systems to monitor for the named PFAS compounds, notify the public of the levels of the PFAS compounds in drinking water, and reduce the levels of the PFAS compounds in drinking water if they exceed the proposed standards.

response to a release of hazardous materials into the Mississippi River or the Barataria Basin. For instance, the Final EIS explains that in the event of a *reportable* release upstream of the intake, CPRA "would cease diversion operations immediately" and the diversion structure would be closed. If such a release occurs downstream of the intake, "a decision would be made regarding any changes in standard operations" in consultation with relevant agencies. Notably, despite numerous comments objecting to the Draft EIS's failure to seriously consider the impacts of nearby industrial facilities, including Alliance Refinery, the Final EIS reiterates that "industrial facilities . . . are regulated by LDEQ [a state agency] through permits that include monitoring and reporting requirements." The Final EIS does not address the fact that many of the industrial facilities that discharge into the lower Mississippi River, including Alliance Refinery, are frequently and repeatedly out of compliance with their permitted discharge limitations.

**H.    FWS and NMFS's BiOps**

107.    The FEIS attached as an appendix BiOps from FWS and NMFS setting forth the agencies' determinations as to whether the MBSD Project will jeopardize the continuing existence of federally-listed species under their respective jurisdictions, or destroy or adversely modify critical habitat. FWS's BiOp contained the agency's concurrence with the Army Corps' determinations that the MBSD Project is not likely to adversely affect the piping plover, or the red knot, and will have no effect on critical habitat for the piping plover or proposed critical habitat for the red knot. With respect to sea turtles, FWS concludes that the Project "may affect, but is not likely to adversely affect" either loggerhead sea turtles, or Kemp's ridley sea turtles.

108.    The piping plover and red knot have been documented in the MBSD Project action area. The Army Corps determined that the MBSD Project "may affect, but is not likely to

adversely affect" either species. As set forth in the concurrence accompanying its BiOp, FWS

concurred with the Army Corps' determination. However, in reaching this determination, neither

FWS nor the Army Corps considered the effects of increased contamination of the Basin due to

the influx of contaminated water and sediment from the Mississippi River. As explained, the

MBSD Project will likely result in increased contamination levels in the Barataria Basin due to

the influx of contaminated River water and sediment, disturbance of contaminated sites in the

Basin, and/or the transportation of hazardous spills or discharges from the River into the Basin.

This increased contamination presents serious risks to species occupying higher trophic levels as

many contaminants tend to bioaccumulate in the tissues of those organisms, leading to serious

adverse effects. Although FWS's concurrence acknowledges that the piping plover and the red

knot feed on benthic organisms, the potential for and effects of bioaccumulation of contaminants

in listed birds is not meaningfully discussed.

109. With respect to sea turtles, FWS acknowledges that loggerhead sea turtles and

Kemp's ridley sea turtles may nest in areas affected by the MBSD Project; however, FWS

concludes without meaningful explanation that the Project "may affect, but is not likely to

adversely affect" either species. A growing body of evidence suggests that sea turtle eggs are

particularly sensitive to environmental contaminants. For example, the 2008 Recovery Plan for

the Northwest Atlantic loggerhead sea turtle DPS—which is present in the action area—lists as

an action "necessary to achieve the goal and objectives of the plan" the need to "ensure sediment

sources do not contain contaminants that impact sea turtle nests," as well as the need to fully

assess the impacts of infrastructure development on the species' recovery. Yet, neither FWS nor

the Army Corps mentions any potential effects to loggerheads or Kemp's ridleys that may result

if these species nest in contaminated sediments introduced into the Barataria Basin by the MBSD Project.

110.    In its BiOp, NMFS determined that MBSD Project would indirectly lead to increased fishing efforts which, in turn, would result in the incidental take of three species of sea turtles: the Kemp's ridley sea turtles, loggerhead sea turtles, and green sea turtles. However, in reaching this conclusion, neither NMFS nor the Army Corps considered the effects of increased contamination of the Basin due to the influx of contaminated water and sediment from the Mississippi River. As explained, the MBSD Project will likely result in increased contamination levels in the Barataria Basin due to the influx of contaminated River water and sediment, disturbance of contaminated sites in the Basin, and/or the transportation of hazardous spills or discharges from the River into the Basin. This increased contamination will have serious direct and indirect effects on listed sea turtles, which NMFS's BiOp fails to meaningfully examine. For example, increased contamination risks the bioaccumulation of contaminants in sea turtles, which tend to occupy higher trophic levels and consume prey (i.e., invertebrates) that are more susceptible to contamination, leading to serious adverse health and behavioral effects. Additionally, increased contamination may impact prey populations, indirectly affecting sea turtles by reducing food availability in the action area. Although NMFS's BiOp acknowledges that the three species of affected sea turtles are vulnerable to adverse health effects from exposure to various contaminants including pesticides, hydrocarbons, and PFAS, it does not meaningfully discuss the MBSD Project's contributions to increased contamination levels in the action area and the consequent effects on listed turtles.

111.    Despite the fact that accidental spills and releases of hazardous materials have repeatedly occurred near the proposed MBSD Project intake, neither FWS's concurrence, nor NMFS's BiOp meaningfully discuss the potential for impacts to listed species and critical habitat from accidental spills during the Project's construction and/or operation. Indeed, neither the concurrence, nor the BiOp even *mention* recent spills and releases from the Alliance Refinery or indeed, any facility in south Louisiana, much less discusses the potential for hazardous spills from such facilities on the Mississippi River. Nor does either document mention the potential for storm hazards of increasing frequency and intensity to increase this risk. Instead, the agencies merely assert without meaningful explanation that spill prevention plans will prevent and minimize spills that may contaminate sediments or nearby waters.

112.    On December 19, 2022, the Army Corps issued its ROD adopting CPRA's preferred alternative as the agency's final decision, and setting forth the agency's final decision to issue the requested Clean Water Act and Rivers and Harbors Act permits to CPRA authorizing the construction and operation of the MBSD Project.

113.    On November 7, 2023, Plaintiffs sent a notice of intent to sue for violations of the ESA to the Secretaries of Commerce and Interior, FWS, NMFS, the Army Corps, and the CPRA. Plaintiffs alleged that the authorization of the MBSD Project violated the strictures of the ESA and its implementing regulations in several respects. For example, Plaintiffs disputed NMFS's determination that the MBSD Project is not likely to appreciably reduce the likelihood of survival or recovery for any of the species, arguing that in reaching this conclusion, neither NMFS nor the Corps considered the effects of increased contamination of the Barataria Basin due to the construction and operation of the Project (including, e.g., from the influx of

contaminated river water, the disturbance of contaminated sediments, and accidental spills). By offering only cursory analyses of these issues, NMFS shirked its regulatory duty to analyze all of the consequences of this particular action—which will inevitably lead to increased contamination of the Barataria Basin—and in so doing, violated the ESA's commands to fully consider the direct and indirect effects of the action and to use the best available science. Plaintiffs likewise disputed FWS and the Army Corps' determination that the Project "may affect, but is not likely to adversely affect" the piping plover, red knot, loggerhead sea turtle, or Kemp's ridley sea turtle. Plaintiffs asserted that FWS and the Army Corps' total disregard of the fact that the Project will almost certainly result in adverse effects to piping plovers, red knots, and sea turtles due to increased contamination of the Basin from the construction and operation of the MBSD Project—and the agencies complete lack of meaningful analysis of the effects to these federally protected species—cannot be squared with the congressional mandate in section 7 of the Act. As a result of these legal deficiencies, as well as others detailed in the notice, Plaintiffs informed the agencies that the Army Corps cannot lawfully proceed with the construction of the Project or any related activities.

## **PLAINTIFFS' CLAIMS FOR RELIEF**

### **Violations of NEPA and the APA**

114.    Plaintiffs incorporate all preceding paragraphs by reference.

115.    By failing to incorporate Neptune Pass into the Delft3D Model, the Army Corps ignored highly relevant data bearing directly on its analysis of the direct, indirect, and cumulative impacts of the MBSD Project and failed to ensure the accuracy of the model's simulations,

undermining the Final EIS's entire analysis of impacts and compromising the integrity of the Final EIS and ROD, in violation of NEPA, its implementing regulations, and the APA.

116.    By failing to engage in a complete analysis of the direct, indirect, and cumulative impacts of the MBSD Project on contaminant levels and concentrations in the Barataria Basin from the influx of contaminated River water and sediment and/or disturbance of contaminated sites in the Basin, and the consequent effects of such contamination on the Basin's environmental resources in the Final EIS, the Army Corps violated NEPA, its implementing regulations, and the APA.

117.    By insisting without explanation that the data required to engage in a meaningful analysis of the relative levels of PFAS and other forever chemicals in the Mississippi River and the Barataria Basin do not exist and that, as a result, the agency could not examine the MBSD Project's likely impacts on the concentration of PFAS and forever chemicals in the Basin and consequent effects on its environmental resources, the Army Corps failed to include information that is highly relevant to reasonably foreseeable significant adverse impacts and essential to a reasoned choice among alternatives in violation of NEPA, its implementing regulations, and the APA.

118.    By ignoring recent guidance from the EPA regarding PFAS and related "forever chemicals," the Army Corps failed to take the requisite "hard look" at the impacts of the potential for contamination of the Barataria Basin and its wildlife—including fish and shellfish— with PFAS and "forever chemicals," in violation of NEPA, its implementing regulations, and the APA.

119.    By failing to engage in a meaningful analysis of the direct, indirect, and cumulative impacts to the Barataria Basin and its environmental resources from the influx of River water and sediment contaminated by hazardous spills or releases of toxic materials into the Mississippi River, the Army Corps violated NEPA, its implementing regulations, and the APA.

120.    By failing to include or obtain information relevant to various adverse impacts that are reasonably foreseeable as a result of the MBSD Project, and by failing to explain why the costs of obtaining such information are so exorbitant as to excuse these major omissions, the Army Corps violated NEPA, its implementing regulations, and the APA.

### FWS's Violations of the ESA and the APA

121.    Plaintiffs incorporate all preceding paragraphs by reference.

122.    By failing to properly consider the effects on the piping plover, red knot, loggerhead sea turtle, and Kemp's ridley sea turtle of increased contamination levels in the Barataria Basin of the Basin due to the influx of contaminated water and sediment from the Mississippi River and/or disturbance of contaminated sites, FWS's concurrence in its BiOp that the MBSD Project is not likely to adversely affect listed species ignores the best available science and fails to establish that the MBSD Project will not adversely affect listed species, in violation of the ESA, its implementing regulations, and the APA.

123.    By failing to properly consider the effects on the piping plover, red knot, loggerhead sea turtle, and Kemp's ridley sea turtle of increased contamination levels in the Barataria Basin of the Basin due to the influx of hazardous spills, releases, and/or discharges originating in the Mississippi River, FWS's concurrence in its BiOp that the MBSD Project is not likely to adversely affect listed species ignores the best available science and fails to

establish that the MBSD Project will not adversely affect listed species, in violation of the ESA, its implementing regulations, and the APA.

### NMFS's Violations of the ESA and the APA

124.    Plaintiffs incorporate all preceding paragraphs by reference.

125.    By failing to properly consider the effects on Kemp's ridley turtles, loggerhead turtles, and green turtles of increased contamination levels in the Barataria Basin of the Basin due to the influx of contaminated water and sediment from the Mississippi River and/or disturbance of contaminated sites, NMFS's BiOp ignores the best available science and underestimates the level of incidental take likely to result from the MBSD Project, in violation of the ESA, its implementing regulations, and the APA.

126.    By failing to properly consider the effects on Kemp's ridley turtles, loggerhead turtles, and green turtles of hazardous spills, releases, and/or discharges originating in the Mississippi River, NMFS's BiOp ignores the best available science and underestimates the level of incidental take likely to result from the MBSD Project, in violation of the ESA, its implementing regulations, and the APA.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an Order:

1.    Declaring that Defendants' decision to undertake the Project is in violation of NEPA and the ESA and is arbitrary and capricious;

2.    Enjoining Defendants from taking any action to implement the Project;

3.    Vacating the challenged Army Corps ROD and Final EIS, NMFS's BiOp, and FWS's concurrence as set forth in its BiOp;

4.      Remanding the challenged decision to the agencies for further analysis and

decision-making consistent with their duties under NEPA, the ESA, and the APA;

5.      Awarding Plaintiffs their reasonable attorneys' fees and costs in this action; and

6.      Providing any other relief that the Court deems proper.

Respectfully submitted,

PIVACH, PIVACH, THRIFFILEY
& DUNBAR, L.L.C.

    /s/ Corey E. Dunbar
GEORGE PIVACH, II (La. Bar. No. 10798)
COREY E. DUNBAR (La. Bar. No. 30144)
ELLEN PIVACH DUNBAR (La. Bar. No. 30018)
JOHN E. PIVACH (La. Bar No. 35283)
8311 Highway 23, Suite 104
Belle Chasse, LA 70037
Telephone: (504) 394-1870
Facsimile: (504) 393-2553
gpivach@pivachlaw.cm
cdunbar@pivachlaw.com
edunbar@pivachlaw.com
jpivach@pivachlaw.com

/s/Elizabeth L. Lewis
Elizabeth L. Lewis (*pro hac vice application
forthcoming*)
D.C. Bar No. 229702
lizzie@eubankslegal.com

/s/ William S. Eubanks II
William S. Eubanks II (*pro hac vice application
forthcoming*)
D.C. Bar No. 987036
bill@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW
Suite 300
Washington, DC 20006
(970) 703-6060